IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OMID E. KIA                    :        CIVIL ACTION
                               :
        v.                     :
                               :
IMAGING SCIENCES               :
INTERNATIONAL, INC., et al.    :        NO. 08-5611

MEMORANDUM

Bartle, C.J.                                      August 20, 2010

        Plaintiff Omid Kia ("Kia") in this diversity action
asserts a variety of state law claims against his former
employer, Imaging Sciences International, Inc. ("ISI"), and ISI's
former owners, Edward Marandola ("Marandola"), Arun Singh
("Singh"), Alan Keim ("Keim"), Henry Tancredi, and John Tancredi.

        Before the court is the motion of defendants for
summary judgment under Rule 56 of the Federal Rules of Civil
Procedure on all counts in Kia's First Amended Complaint (the
"Amended Complaint").

                               I.

        We grant summary judgment "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  "A motion for summary judgment will not
be defeated by 'the mere existence' of some disputed facts, but
will be denied when there is a genuine issue of material fact."
Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d

Cir. 2009) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)). A fact is "material" when it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.

To decide if a dispute regarding a material fact is "genuine," we ask whether any reasonable jury could return a verdict in favor of the non-moving party. <u>Id.</u> at 248-49. In making this determination, we view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. <u>Am. Eagle Outfitters</u>, 584 F.3d at 581. The non-moving party bears a burden to "provide admissible evidence containing specific facts showing that there is a genuine issue for trial." <u>Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare</u>, 402 F.3d 374, 379 (3d Cir. 2005) (internal quotation marks omitted); <u>see</u> <u>also</u> Fed. R. Civ. P. 56(e). If the non-moving party establishes that "there is a disagreement about the facts or the proper inferences to be drawn from them," a trial becomes necessary "to resolve the conflicting versions of the parties." <u>Peterson v. Lehigh Valley Dist. Council</u>, 676 F.2d 81, 84 (3d Cir. 1982).

## II.

Kia filed this action on December 2, 2008 and amended his complaint on January 22, 2009.[1] Although the Amended

---

1. The Amended Complaint initially included as a defendant Imaging Sciences International, LLC. However, Kia reached a settlement with this defendant and all claims against it were
(continued...)

Complaint originally contained fifteen counts, Kia has since decided not to pursue the following:  Count II (breach of oral contract against the individual defendants); Count III (fraudulent inducement of oral contract against all defendants); Count IV (breach of written contract against ISI); Count V (fraudulent inducement of written contract against all defendants); Count VI (negligent misrepresentation against Marandola); Count IX (promissory estoppel) as to Singh, Keim, and John Tancredi[2]; Count X (tortious interference with contract) as to Marandola; Count XIV (defamation) as to Marandola; and Count XV (misappropriation of trade secrets against ISI).

The remaining claims are as follows:  Count I against ISI for breach of oral contract; Count VII against all defendants for a declaratory judgment that the Confidential Information and Invention Assignment Agreement signed by Kia is invalid and unenforceable; Count VIII against ISI for promissory estoppel; Count IX against defendants Marandola and Henry Tancredi for promissory estoppel; Count X against Singh for tortuous

1.(...continued)
dismissed by stipulation on December 3, 2009.

2.    In a section entitled "The Counts Being Asserted" in Kia's brief in opposition to defendants' motion for summary judgment, Kia states that he will no longer pursue Count IX as to Henry Tancredi, John Tancredi, and Keim.  This would leave Marandola and Singh as the remaining defendants named in Count IX of the Amended Complaint.  However, in the body of his brief, Kia argues Count IX against Marandola and Henry Tancredi, not Singh.  Because there is no evidence that Singh ever made a promise to Kia, we will presume that Kia intends to pursue Count IX against Marandola and Henry Tancredi, and that his statement to the contrary was a typographical error.

interference with contract; Count XI against all defendants for fraudulent conveyance; Count XII against Marandola, Singh, Keim, Henry Tancredi, and John Tancredi for unjust enrichment; Count XIII against Marandola, Singh, Keim, Henry Tancredi, and John Tancredi for conversion; and Count XIV against Singh for defamation.

III.

A summary of the facts relevant to the instant motion, taken in the light most favorable to Kia, are as follows.

ISI, a Delaware corporation, was founded in 1992 by defendants Singh, Henry Tancredi, and John Tancredi for the purposes of designing, manufacturing, and selling high-end dental imaging systems. Marandola joined ISI as a co-owner in the fall of 1992, followed by Keim, who joined as a co-owner in 1995. All of the outstanding voting shares of ISI were divided equally among the five individual defendants, with each owner holding a 20% interest.

In 2003, ISI developed a 3-D, digital, imaging machine known as the I-CAT, which the company expected would be highly successful. The I-CAT was capable of creating a three-dimensional, digital image of a patient's jaw. This image was produced using special "reconstruction" software which ISI licensed from Xoran Technologies.

In December 2003, ISI expressed interest in hiring Kia, an electrical engineer with experience in digital imaging technology, to work on the I-CAT software. In his second

-4-

interview, Kia was offered a salary of $85,000, which he rejected

as too low.  Kia later appeared for a third interview, at which

only he and Marandola were present.  During this third interview,

Marandola offered to Kia a yearly salary of $108,000.  According

to Kia, this new offer prompted the following exchange between

Kia and Marandola:

> I said that that's still very low, that that
> might -- a going rate in a place like this
> would be around $125,000.  And 108 is way too
> low.
>
> To which I believe he said, If we can start
> on this, and we don't have a product yet, we
> don't have a large revenue stream, is that as
> things pick up, yours -- your salary, your --
> your compensation would improve as such.
>
> To which I said, Okay, well, we can make
> $108,000 work, given that you guarantee that
> I would be taken care of as the company moves
> forward, starts making the extra salary.
>
> To which he said, What do you -- What do you
> mean exactly?
>
> To which I described, Well, other companies
> utilize different tactics, like golden
> parachutes, golden handcuffs, to take care of
> their key people.  And I'm asking something
> in that -- in that sense to make sure that
> I'm taken care of once the value of the
> company goes up, the company starts making
> money.
>
> And he -- he said that, Well, I don't exactly
> know what -- what you mean by golden
> parachutes, by golden handcuffs, but be
> assured of one thing; that you would be one
> of the senior management team, you would be
> one of us, and that the value that you bring
> to the company will be measured in terms of
> the success of the company, and that you
> would be compensated in par with respect to
> the rest of us, meaning the owners.

Kia Dep. 425:3-426:9, Feb. 16, 2010.  Kia asserts that the above

exchange constitutes an oral agreement between Kia and ISI

pursuant to which Kia is entitled to a one-sixth interest in any

increased value of ISI.  While defendants deny the substance of

the exchange as described by Kia and refute his claim that an

oral contract exists, the parties do agree that none of the terms

of the alleged oral agreement was ever reduced to writing.

Kia accepted ISI's offer of employment and began work

as a "Chief Scientist" on January 2, 2004.  Kia states that he

worked to develop and improve software used in the I-CAT machine,

and facilitated the launch of a successor device, known as the I-

CAT Platinum.

While at ISI, Kia reported directly to defendant Singh.

The relationship between Kia and Singh was contentious, to say

the least.  They frequently disagreed about the decisions Kia

made with respect to his work and his interactions with third

parties.  Sometime in 2006, Singh drafted a performance review of

Kia in which he specifically criticized Kia's performance on a

project known as "DICOM," his failure timely to submit certain

patent applications, his failure to meet deadlines for filing

grant applications with the National Institute of Health, and his

failure to manage properly engineers working at an office in

Delhi, India.  Singh also stated that Kia "[b]ecomes

dysfunctional and disorganized in any long term task," "lacks

tact and constructive communication skills whenever confronted

with anything that disagrees with his point of view" and "has
used disparaging and confrontational language."

As early as 2005, outside companies expressed interest
in purchasing ISI, and in late 2005 or early 2006, Kia learned
that ISI had found a number of potential suitors.  It was around
that time that the individual defendants began negotiations to
sell ISI to a company known as Danaher Corporation ("Danaher").
In order to facilitate the sale, ISI required Kia, along with all
of its other employees, to sign a Confidential Information and
Invention Assignment Agreement ("IAA") which, among other things,
assigned to ISI any rights that he may have had to intellectual
property developed in connection with his employment at ISI.  Kia
was also required to identify any inventions developed prior to
his employment at ISI, as such inventions were excluded from the
agreement.

Kia was initially reluctant to sign the IAA, because he
had concerns regarding some of its terms and believed the
agreement to be a "one-sided" deal.  However, after negotiating
with ISI's legal counsel, Cheryl Slipski ("Slipski"), and
apparently receiving assurances from Henry Tancredi that he would
be "taken care of," Kia signed the IAA.  ISI then requested that
Kia complete and sign a second IAA as his list of prior
inventions in the first IAA was overly vague.  Kia again
negotiated the terms of the agreement with Slipski and eventually
signed a modified IAA which, due to the inability of Kia to
articulate accurately any prior inventions, simply declared that

no such prior inventions had been incorporated into ISI's products.

On January 2, 2007, the five owners of ISI sold all of their voting shares in ISI to Danaher for a gross sale price of $140 million. The majority of the net proceeds was divided equally between the five owners: Marandola, Singh, Keim, Henry Tancredi, and John Tancredi. However, a portion was set aside in a "pool" used to pay discretionary bonuses to employees. The owners held private, informal meetings to determine the amount that each employee would receive, considering such factors as the amount of time an employee had worked for ISI, the value an employee added to the company, and whether an employee was a "team player." The calculation of bonuses was not rigidly formulaic, however, as much weight was placed on intangible factors such as whether an employee had persevered through ISI's early years when hours were high and compensation was low. After an initial bonus amount was proposed for a given employee, each owner was given an opportunity to express his views on the appropriateness of that amount, and the owners debated among themselves until consensus was reached.

The starting proposal for Kia's bonus was approximately $350,000. Defendant Singh believed that this amount was too high because: (1) unlike other employees who worked for ISI during its early years and received a salary well below market rate, Kia joined the company after it had already become profitable and received compensation that Singh believed to be significantly

greater than market rate; and (2) Singh believed that Kia was disruptive, undermined the company, demoralized people, and was generally a source of negativity within ISI. After considering Singh's concerns, the owners decided to award Kia a bonus of $50,000.

Kia was apparently not told the amount of his bonus until June 2008. He asserts that, prior to June 2008, he was assured by Marandola and Henry Tancredi that bonus money had been "put aside for him" or that Danaher "had something special planned for him." When Kia was told by Marandola that his bonus would be $50,000, he protested that it was an insult to him and that, pursuant to the alleged oral contract between him and ISI, he should have shared equally in the proceeds received by the five owners from Danaher.

Kia describes the alleged oral contract as follows: "Marandola thus promised Dr. Kia that in exchange for accepting a lower salary, Dr. Kia would be fairly compensated by a reasonable share of the increased value if ISI Inc were to become successful." Kia maintains that the "increased value of ISI" is to be measured as the difference between $2.5 million (the alleged "value" of ISI at the time Kia was hired)[3] and $140

_____

3. To establish this figure, Kia relies on a document signed by the five owners on November 2, 2003. At that time, ISI was negotiating terms of employment with a consultant named Edward Brill ("Brill"). The agreement of November 2, 2003 provided that, shortly after signing the agreement, Brill would receive 1% of the authorized and issued shares of ISI and would later receive an additional 1% for each five months of consulting
(continued...)

million (the alleged "value" of ISI at the time it was sold to Danaher).

IV.

We turn first to Kia's claim against ISI for breach of oral contract in Count I of the Amended Complaint. The parties dispute: (1) the words used by Kia and Marandola during the conversation from which the oral contract allegedly arose; (2) the intentions of the parties with regard to the meaning of those words; and (3) the existence of an oral agreement. Having reviewed the language as a whole, it appears that, at this stage of the litigation, there are genuine issues of material fact with regard to this count. See Anderson, 477 U.S. at 248-49. Accordingly, we will deny defendants' motion for summary judgment as to Kia's Count I claim for breach of oral contract.

V.

In Count VII, Kia seeks a declaratory judgment that the IAA is unenforceable for lack of consideration.[4] In this

---

3.(...continued)
services provided by him to ISI. The agreement stated that "Edward T. Brill and the shareholders included in the agreement agree and accept a current valuation of the firm of $2.5 million."

4. In Kia's Amended Complaint, he formulates his claim as one regarding a failure of consideration, whereas in his brief in opposition to defendants' motion for summary judgment he refers to a lack of consideration. To the extent that there is a legal distinction between "failure" and "lack" of consideration, Kia's claim is most accurately categorized as one alleging lack of consideration, as all of his arguments focus on the alleged absence of adequate consideration at the time of contract
(continued...)

diversity action, we apply the substantive law of Pennsylvania.[5]
Chamberlain v. Giampapa, 210 F.3d 154, 158-59 (3d Cir. 2000)
(citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).

In Pennsylvania, so long as the parties express their
consent to be legally bound a contract will not be found invalid
for lack of consideration.  McGuire v. Schneider, Inc., 534 A.2d
115, 118 (Pa. Super. Ct. 1987), aff'd per curiam, 548 A.2d 1223
(Pa. 1988).  The Pennsylvania Uniform Written Obligations Act
("UWOA") provides that "[a] written release or promise, hereafter
made and signed by the person releasing or promising, shall not
be invalid or unenforceable for lack of consideration, if the
writing also contains an additional express statement, in any
form of language, that the signer intends to be legally bound."
33 Pa. Cons. Stat. Ann. § 6.

Section 7.1 of the IAA, entitled "Binding Effect;
Assignment; Amendment," states, in relevant part:  "This
Agreement shall be binding upon me, my heirs, executors, assigns
and administrators and is for the benefit of the Company and its
successors and assigns."  This provision constitutes "an ...
express statement ... that the signer intends to be legally

---

4.(...continued)
formation.  See McGuire v. Schneider, Inc., 534 A.2d 115, 118
(Pa. Super. Ct. 1987), aff'd per curiam, 548 A.2d 1223 (Pa.
1988); 3 Williston on Contracts § 7:11 (4th ed. 2007).

5.  Section 7.3 of the IAA provides, "This Agreement shall be
construed in accordance with, and all actions arising under or in
connection therewith shall be governed by, the internal laws of
the Commonwealth of Pennsylvania, without regard to its conflict
of law principles."

bound" under the UWOA, and therefore the IAA cannot be invalid or
unenforceable for lack of consideration.  See e.g., Laudig v.
Laudig, 624 A.2d 651, 654-55 (Pa. Super. Ct. 1993) (citing Kay v.
Kay, 334 A.2d 585, 587 (Pa. 1975)); McGuire, 534 A.2d at 118.
Accordingly, we will grant defendants' motion for summary
judgment as to Count VII.

VI.

        Kia pleads claims for promissory estoppel in Count VIII
against ISI, and in Count IX against Marandola and Henry Tancredi
as an alternative to his claim for breach of oral contract.

        Under Pennsylvania law, where an agreement is not
enforceable due to lack of consideration, a plaintiff may recover
in equity under a promissory estoppel theory.  Crouse v. Cyclops
Indus., 745 A.2d 606, 610 (Pa. 2000).  Pennsylvania has adopted
§ 90 of the Restatement (Second) of Contracts, which provides,
"[a] promise which the promisor should reasonably expect to
induce action or forbearance on the part of the promisee or a
third person and which does induce such action or forbearance is
binding if injustice can be avoided only by enforcement of the
promise."  Thatcher's Drug Store of Goshen, Inc. v. Consol.
Supermarkets, 636 A.2d 156, 160 (Pa. 1994) (quoting Restatement
(Second) of Contracts § 90(1)); see also Lobolito, Inc. v. N.
Pocono School Dist., 755 A.2d 1287, 1292 n.9 (Pa. 2000).  To make
out such a claim, a plaintiff must establish that:  "1) the
promisor made a promise that he should have reasonably expected
to induce action or forbearance on the part of the promisee; 2)

the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." Crouse, 745 A.2d at 610; see also Health Robotics, LLC v. Bennett, No. 09-0627, 2009 WL 5033966, at *8 (E.D. Pa. Dec. 22, 2009).

Kia appears to premise his promissory estoppel claims in Counts VIII and IX on two separate theories. First, he maintains that the alleged promise by Marandola during Kia's third interview to provide Kia with a reasonable share of the increased value of ISI induced Kia to accept a job with ISI rather than some other company. Kia, however, presents no evidence, such as alternative employment opportunities, to show that such reliance caused him to suffer any detriment at all, let alone that justice requires enforcement of the alleged promise. See Ankerstjerne v. Schlumberger, LTD., No. 03-3607, 2004 WL 1068806, at *6 (E.D. Pa. May 12, 2004), aff'd 155 Fed. App'x 48, 51-52 (3d Cir. 2005). It is well settled that "[a] party who invokes the rule of promissory estoppel as a basis for relief has the burden of proving that he acted to his detriment in reliance on the promise." Kaufman v. Mellon Nat'l Bank & Trust Co., 366 F.2d 326, 332 (3d Cir. 1966) (citing Berry v. Maguire, 56 A.2d 282 (Pa. Super. Ct. 1948)). In doing so, a plaintiff defending against a motion for summary judgment "must adduce more than a mere scintilla of evidence in [his] favor, ... and cannot simply reassert factually unsupported allegations contained in [his] pleadings." Williams v. Borough of W. Chester, 891 F.2d 458, 460

(3d Cir. 1989). Thus, even if we were to assume that Kia was induced to accept employment at ISI due to the alleged oral promise by Marandola, Kia's failure to present any proof to support his assertion of detrimental reliance is fatal to his claim.[6]

Kia's second theory of promissory estoppel is premised on alleged promises by Marandola and Henry Tancredi in relation to Kia's signing the IAA. According to Kia, Marandola and Henry Tancredi assured Kia that, if he signed the IAA, he would be "taken care of" and that he relied on these promises to his detriment in assigning his intellectual property rights to ISI. Although Kia formulates this claim as one for "promissory estoppel," it is actually an improper attempt to vary the terms of an integrated, written agreement based on alleged oral statements make prior to his signing it.[7] Under Pennsylvania

---

6. We also note that Henry Tancredi cannot be liable under Count IX based on Kia's first theory in any event, since it is undisputed that he never made any promises to Kia in connection with Kia's accepting employment at ISI.

7. The IAA expressly states, in Section 7.4, that "[t]his Agreement sets forth the parties' mutual rights and obligations with respect to the subject matter hereof and it is intended to be the final, complete, and exclusive statement of the terms of the parties' agreement. This Agreement supersedes all evidence of any prior or contemporaneous statements or agreements." Moreover, in Section 7.12, Kia acknowledged, "that I have had the opportunity to consult legal counsel in regard to this Agreement, that I have read and understand this Agreement, that I am fully aware of its legal effect, and that I have entered into it freely and voluntarily and based on my own judgment and not on any representations or promises other than those contained in this Agreement." (emphasis added).

(continued...)

law, "[w]here parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement." Scott v. Bryn Mawr Arms, Inc., 312 A.2d 592, 594 (Pa. 1973). Thus, "[a]ll preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract, ... and unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence." Gianni v. R. Russel & Co., 126 A. 791, 792 (Pa. 1924) (internal quotation marks omitted). Kia does not allege fraud, accident, or mistake, and he therefore cannot insert into the IAA terms which do not appear in the writing.

For the above reasons, we will grant defendant's motion for summary judgment as to Counts VIII and IX of Kia's Amended Complaint.

## VII.

In Count X, Kia asserts that Singh intentionally interfered with the alleged oral contract between Kia and ISI by preventing Kia from receiving the full compensation allegedly due him upon the sale of ISI to Danaher. This claim is based on Kia's allegation that Singh was instrumental in persuading his co-owners to reduce Kia's bonus from $350,000 to $50,000 during

---

7.(...continued)

meetings involving Singh, Marandola, Keim, Henry Tancredi, and John Tancredi to determine the amounts to be awarded each employee from the proceeds of the sale of ISI to Danaher.

The Pennsylvania Supreme Court has adopted the following definition of tortious interference with contract as set forth in Restatement (Second) of Torts § 766:

> [o]ne who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

See Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978). A plaintiff bringing a claim for tortious interference with contract must establish the following elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Crivelli v. General Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000) (quoting Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)).

Tortious interference with contract thus requires the involvement of at least three parties—the two contracting parties

-16-

and a third person who interferes with that contract. As a general rule, corporate officers are immune from interfering with the contracts of their corporation, as the officers and the corporation are considered a single entity when the officer is acting within the scope of his employment. See <u>Michelson v. Exxon Research and Eng'g Co.</u>, 808 F.2d 1005, 1007-08 (3d Cir. 1987); <u>Am. Trade Partners, L.P. v. A-1 Int'l Importing Enters., Ltd.</u>, 757 F. Supp. 545, 555 (E.D. Pa. 1991); <u>Daniel Adams Assoc., Inc. v. Rimbach Pub., Inc.</u>, 519 A.2d 997, 1000-03 (Pa. Super. Ct. 1987). Thus, a corporate officer can be liable for tortious interference only if he "was acting in a personal capacity or outside the scope of his authority." <u>Am. Trade Partners, L.P.</u>, 757 F. Supp. at 555; <u>see also</u> <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 173 (3d Cir. 2001).

Here, Kia alleges that Singh, an officer of ISI, tortiously interfered with an oral contract between ISI and Kia. However, absent evidence from which a reasonable fact finder could conclude that Singh acted in his personal capacity or outside the scope of his authority, he cannot be liable for interfering with a contract to which ISI is a party. See <u>Emerson Radio Corp.</u>, 253 F.3d at 173. Kia provides no such evidence. To the contrary, he bases his claim entirely on unspecified statements allegedly made by Singh during a meeting between Singh and the other four individual defendants, a meeting which was held for the sole purpose of determining employee compensation. Any statements by Singh during this meeting regarding Kia's work-

related performance or the amount Kia was to receive as a discretionary bonus were clearly made pursuant to his authority as an owner and officer of ISI.[8]  In the absence of any evidence to support his allegation that Singh acted outside the scope of his authority, Kia cannot survive the defendants' motion for summary judgment.  See Anderson, 477 U.S. at 249; Belas v. Juniata County School Dist., No. 04-505, 2005 WL 2100666, at *12 (W.D. Pa. 2005), aff'd, 202 Fed. App'x 585 (3d Cir. 2006).

Accordingly, we will grant defendants' motion for summary judgment with respect to Kia's Count X claim against Singh for tortious interference with contract.

### VIII.

In Count XI, Kia asserts a claim for fraudulent conveyance against ISI, Marandola, Singh, Keim, Henry Tancredi and John Tancredi.  He alleges that, in light of the oral agreement between him and ISI regarding his right to one-sixth of the increased value of ISI, he was a creditor of ISI at the time the company was sold to Danaher.  Kia maintains that ISI's transferring to the individual defendants the proceeds from that sale rendered ISI insolvent and was done with the intent to hinder, delay, or defraud him as a creditor of ISI.  See 12 Pa.

---

8.  Kia asserts that, during this meeting, Singh relied on the 2006 employee review memorandum in which Singh had detailed specific instances of substandard job performance by Kia.  Kia disputes the validity of Singh's comments as contained in the memorandum.  In any event, those statements fall squarely within the scope of Singh's authority and therefore cannot support a claim of tortious interference with contract.

Cons. Stat. Ann. § 5104.  Thus, he seeks to set aside those transfers as fraudulent conveyances.  Id.  At this stage of the litigation, there are genuine issues of material fact with regard to this issue.  As such, we will deny defendants' motion for summary judgment with regard to Kia's Count XI claim for fraudulent conveyance.

IX.

We next consider Kia's Count XII claim for unjust enrichment against all of the individual defendants.  Kia alleges that, with an expectation that he would be compensated according to the alleged oral agreement, Kia conferred benefits on the individual defendants by contributing to the increased value of ISI, a benefit that the individual defendants readily accepted by disbursing to themselves the proceeds from the sale of their voting shares to Danaher.  It would be unjust, argues Kia, to allow ISI's owners to retain this benefit without providing restitution to him for his contribution to the sale value.

To recover under the equitable doctrine of unjust enrichment, otherwise known as "quasi-contract" or "implied-in-law contract," a plaintiff must establish the following: "'benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" Wiernik v. PHH U.S. Mortg. Corp., 736 A.2d 616, 622 (Pa. Super. Ct. 1999) (quoting Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super.

Ct. 1993), aff'd per curiam, 637 A.2d 276 (Pa. 1994)); see also

EBC, Inc. v. Clark Bldg. Sys., Inc., No. 09-1182, 2010 WL

3239475, at *14 (3d Cir. Aug. 18, 2010).

To determine if the doctrine applies, we focus on

whether the enrichment of the defendant was unjust. Stoeckinger

v. Presidential Fin. Corp. of Del. Valley, 948 A.2d 828, 833 (Pa.

Super. Ct. 2008). Although the answer to this question "depends

on the unique factual circumstances of each case,... [t]he

doctrine does not apply simply because the defendant may have

benefited as a result of the actions of the plaintiff." Styer,

619 A.2d at 350. Finally, a plaintiff cannot recover under an

unjust enrichment theory where a contract exists between the

parties. Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. Ct.

1999); Birchwood Lakes Cmty. Ass'n Inc. v. Comis, 442 A.2d 304,

309 (Pa. Super. Ct. 1982).

Assuming, as we must at this stage, that Kia's work at

ISI actually contributed to the increased value of the company

and therefore conferred a benefit on the individual defendants

who profited from the sale of ISI to Danaher, Kia's quasi-

contract claim nevertheless must fail as there is no evidence

that the enrichment of the individual defendants, under the

circumstances here, was unjust. As noted above, a plaintiff

cannot recover under an unjust enrichment theory where a contract

exists between the parties. Thus, Kia's claim presupposes the

jury's rejecting the existence of the alleged oral contract

between Kia and ISI under which ISI promised him a share of the

-20-

increased value of the company in exchange for his accepting employment. However, in the absence of this contract, Kia could have no expectation that he would be provided any of the proceeds from the sale of ISI. Indeed, Kia "has not shown that he provided the defendants with anything more than the work he was hired to do." Ankerstjerne, 2004 WL 1068806, at *7; see also Herbst v. Gen. Accident Ins. Co., No. 97-8085, 1999 WL 820194, at *9 (E.D. Pa. Sept. 30, 1999). That his work may have indirectly contributed to the profits realized by ISI's owners upon the sale of the company does not give Kia a legal right to share in those profits under an implied-in-law contract. We will therefore grant defendants' motion for summary judgment with respect to Count XII of the Amended Complaint.

X.

In Count XIII, Kia pleads a claim of conversion against all of the individual defendants. He alleges that Marandola, Singh, Keim, Henry Tancredi, and John Tancredi deprived him of his share of the proceeds from the sale of ISI and converted those profits for their own personal benefit without his consent.

Conversion is defined as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Francis J. Bernhardt, III, P.C. v. Needleman, 705 A.2d 875, 878 (Pa. Super. Ct. 1997) (internal quotation marks omitted). Money may be the subject of a conversion only where the plaintiff had a property interest in the money at the time of the alleged

-21-

conversion.  Montgomery v. Fed. Ins. Co., 836 F. Supp. 292, 300

(E.D. Pa. 1993); Shonberger v. Oswell, 530 A.2d 112, 114-15 (Pa.

Super. Ct. 1987); Lee Tire and Rubber Co. v. Bonholtzer, 81 Pa.

D. & C. 218, 221 (Ct. Comm. Pl. Del. Cty. 1951) (citing Pearl

Assur. Co., LTD. v. Nat'l Ins. Agency, Inc., 30 A.2d 333, 337

(Pa. Super. Ct. 1943)).[9]  Thus, the mere failure to pay a debt is

not conversion.  Needleman, 705 A.2d at 878.

        Kia's conversion claim fails for two reasons.  First,

there is nothing in the record to show that he had any property

interest in the money allegedly converted by the individual

defendants.  That money was paid to the defendants in exchange

_____

9.  For example, in Montgomery v. Federal Insurance Co., the
court held that an insured could not sue his insurer for
conversion when the insurer retained premium payments and refused
to pay benefits.  836 F. Supp. at 301.
    In Lee Tire and Rubber Co., the plaintiff delivered
merchandise to a retailer on credit based on an oral agreement
under which the retailer promised to endorse over to plaintiff
any checks received from Upper Darby Township in exchange for
plaintiff's merchandise.  After the retailer deposited the checks
in its own account instead of endorsing them over to plaintiff,
the plaintiff sued for conversion.  The court determined that
plaintiff had no property interest in the checks, because they
did not "belong" to the plaintiff until an endorsement was made,
and the oral agreement itself was  insufficient to transfer legal
title absent endorsement.  81 Pa. D. & C. at 222.
    By contrast, in Shonberger v. Oswell, a plaintiff retail-
supplier entered a consignment agreement with a defendant store-
owner under which the defendant would sell plaintiff's goods
through his stores, keep a percentage of the proceeds, and remit
the remainder to the plaintiff.  The defendant failed to remit
payment to the plaintiff, instead depositing the money into his
company's account, and the plaintiff sued for conversion.  The
court held that, because the parties were working under a
consignment agreement under which the plaintiff retained title to
the goods, the goods and proceeds "belonged" to plaintiff.  530
A.2d at 115.  The money not remitted could therefore be the
subject of a claim for conversion.  Id.

for their voting shares of ISI.[10]  Kia does not now and has never

alleged that he owned shares in ISI or otherwise had an ownership

interest in the company.  He therefore has no evidence that the

money allegedly converted by the individual defendants "belonged"

to him.  See Rahemtulla v. Hassam, 539 F. Supp. 2d 755, 777 (M.D.

Pa. 2008); Binns v. Flaster Greenberg, P.C., 480 F. Supp. 2d 773

(E.D. Pa. 2007);  NovaCare, Inc. v. S. Health Mgmt. Inc., No. 97-

5903, 1998 WL 470142, at *2 (E.D. Pa. Aug. 11, 1998); Pearl

Assur. Co., LTD., 30 A.2d at 337; Lee Tire and Rubber Co., 81 Pa.

D. & C. at 221-22.[11]  At best, Kia claims that he was owed a one-

sixth share of the proceeds as compensation for his services per

the terms of the alleged oral contract between him and ISI.  In

other words, he seeks to recover a debt.  As noted above, a claim

---

10.  The exact details of the transaction are complex and
somewhat unclear from the information so far provided to the
court.  Whatever the exact transactional procedure by which the
sale occurred, our conclusion stands.

11.  In Binns v. Flaster Greenberg, P.C., this court reasoned
that a plaintiff-attorney did not have a property interest in the
money allegedly owed to him for the services he rendered on
behalf of the defendant-law-firm.  480 F. Supp. 2d at 781-82.
The court noted that there was "no separate set of funds
earmarked for [the plaintiff]," there was no agreement between
the plaintiff and the defendant to "segregate funds" paid to the
defendant for the plaintiff's time, and therefore the plaintiff
could not establish "that he had a specified interest in a
particular set of [the defendant's] funds."  Id. at 782.
    Similarly, in NovaCare v. Southern Health Management Inc., a
plaintiff therapy-service provider sued two defendant nursing-
homes for failure to pay for therapy services provided to the
defendants pursuant to certain agreements.  The court held that
the plaintiff's contractual right to receive payment for the
services provided under its therapy service agreement did not
amount to a property interest in the money owed and could not
support a claim for conversion.  1998 WL 470142, at *3.

of conversion does not lie under such circumstances.  See
NovaCare, 1998 WL 470142, at *2.

        The second reason Kia cannot go forward with this claim
is that it is barred by the "gist of the action" doctrine.  That
doctrine "operates to preclude a plaintiff from re-casting
ordinary breach of contract claims into tort claims." Pittsburgh
Constr. Co. v. Griffith, 834 A.2d 572, 581 (Pa. Super. Ct. 2003).
Accordingly, "a claim should be limited to a contract claim when
the 'parties' obligations are defined by the terms of the
contracts, and not by the larger social policies embodied by the
law of torts.'"  eToll, Inc. v. Elias/Savion Advert., Inc., 811
A.2d 10, 14 (Pa. Super. Ct. 2002) (quoting Bohler-Uddeholm Am.,
Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 (3d Cir. 2001)).
The gist of the action principle bars tort claims under the
following circumstances:  (1) where the claim arises solely from
a contract between the parties; (2) where the duties allegedly
breached were created by a contract; (3) where liability is
derived from a contract; or (4) where the success of the tort
claim is dependent on the terms of a contract.  See Griffith, 834
A.2d at 582.

        Here, Kia alleges that the individual defendants
converted money owed to him under the terms of the alleged oral
agreement between him and ISI, that is, the agreement on which
Kia has pleaded his Count I claim for breach of contract.  Kia's
conversion claim is therefore entirely dependent on the existence
and validity of that agreement, as there can be no liability in

-24-

its absence.  As explained in <u>Pittsburgh Construction Co. v.</u>
<u>Griffith</u>, "[Kia's] tort and breach of contract claims are
inextricably intertwined, the success of the conversion claim
depending entirely on the obligations as defined by the
contract."  834 A.2d at 584.  Therefore, the gist of the action
doctrine requires that Kia proceed solely on the basis of his
breach of contract claim.  <u>Id.</u>

We will grant summary judgment in favor of the
defendants with respect to Kia's Count XIII claim for conversion.

XI.

As his final claim, Kia seeks to hold defendant Singh
liable for defamation in Count XIV.  In an action for defamation,
the plaintiff bears the burden of proving:

> (1) The defamatory character of the
> communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its
> defamatory meaning.
> (5) The understanding by the recipient of it
> as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff
> from its publication.
> (7) Abuse of a conditionally privileged
> occasion.

42 Pa. Cons. Stat. Ann. § 8343(a); <u>Foster v. UPMC S. Side Hosp.</u>,
No. 1995 WDA 2008, 2010 Pa. Super. LEXIS 2097, at *15 (Pa. Super.
Ct. Aug. 6, 2010).  The defendant has the burden of establishing:
"(1) the truth of the defamatory communication; (2) the
privileged character of the occasion on which it was published;
[and/or] (3) the character of the subject matter of defamatory

comment as of public concern."  <u>Moore v. Cobb-Nettleton</u>, 889 A.2d
1262, 1267 (Pa. Super. Ct. 2005) (quoting 42 Pa. Cons. Stat. Ann.
§ 8343(b)).

        In 2006, Singh prepared a written review of Kia's work
performance, which was distributed to Marandola, Henry Tancredi,
David Cowan (Vice President of Engineering), Anthony Reynolds
(Vice President of International Sales and Strategic Alliances),
Elizabeth Qualtier (Director of Technical Marketing), Stephanie
Mandell (Human Resources), and Karen Kirchner (Human Resources
Consultant).  That review contained four statements which Kia
considers defamatory.  First, Singh asserted that Kia's
participation in the DICOM project caused significant delay and
forced the company to incur unnecessary costs.  Second, with
respect to certain patents that ISI was required to file within
the 12-month period beginning in May, 2005, Singh wrote,

            Omid [Kia] had led the effort of working with
            the patent attorney to draft these
            [provisional patents], and it was his
            responsibility to complete the filing in the
            ensuing 12-month period.  However, he had not
            lifted a finger in the next 10 months ...
            [t]his necessitated me to take over this
            task, and I had to spend enormous hours with
            the patent attorney along with Uwe's[12] help
            to get this done.  Another example of poor
            time and task management.

Third, with regard to the filing of certain applications to the
National Institute of Health ("NIH"), Singh said, "Omid [Kia] was

_____

12.  Uwe Mundry was an employee of ISI and is not a party to this
action.

supposed to file NIH grant applications for certain research
projects we had identified, but missed several filing deadlines
in a row.  Ultimately, we approved $14,000 in March to hire a
consultant that he recommended ..., but even he has missed the
next 2 deadlines due to lack of definition of what needs to be
done."  Finally, he wrote,

> The engineers in the Delhi office reported
> directly to Omid [Kia], but he totally lost
> control of the personnel and did not have the
> slightest idea what they were actually doing,
> not to mention unclear project definition and
> guidance.  ...  The 2 quite capable engineers
> diverted themselves to their own Ph.D. and
> outside work, blatantly throwing sand in
> Omid's eyes, and he did not have the
> slightest clue.  This went on for about 1
> year, while Omid failed miserably in defining
> and leading any project there, except for
> certain short term items, until I realized
> what was really going on.

On December 21, 2006, Singh wrote an email to Marandola
and Henry Tancredi, which Singh then forwarded to Stephanie
Mandell.  Singh stated, "This stretched out pattern of behavior
has been truly damaging to the entire company in terms of
divisiveness, adversarial situations affecting teamwork and
morale, not to mention Omid's total lack of productivity and
inability to complete any single project."

On April 25, 2007, emails were exchanged between a
number of ISI employees who were working to set up a virtual
private network (VPN) to allow remote access to certain
information in the company's computer system.  After proposing a
solution, Kia wrote:  "Please, for the love of god since no one

seems to care as much about this, verify that this is sufficient protection to limit exposure to not only our source code in the dev folder but also to the rest of the LAN network."  Singh copied and pasted the beginning portion of this sentence into a reply email, and added the following commentary, "This is the same person [referring to Kia], who despite unequivocal caution from Mike, opened up our customers to unobstructed virus attacks via his version of VPN for remote access to computer sites." Singh's reply was sent to Kia, Marandola, Mike Bowen (IT technician), Dave Cowan, and Stephanie Mandell.

Defendants first contend that Kia's defamation claim is barred by Pennsylvania's one-year statute of limitations, as all of the allegedly defamatory statements were made more than one year prior to Kia's filing his complaint on December 12, 2009. See 42 Pa. Cons. Stat. Ann. § 5523(1).  Kia responds that, although the statements were made more than one year prior to his filing the initial complaint, he did not know that he had been injured by those statements until he was made aware that his bonus was reduced from $350,000 to $50,000 largely due to comments made about him by Singh, comments which were supposedly buttressed by the allegedly defamatory statements listed above.

According to Kia, he did not learn this information until June of 2008, which was less than a year prior to his initiating this action.  Kia asserts that his claim is therefore saved by the discovery rule, under which "the statute of limitations does not begin to run until the plaintiff has

discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury." Gallucci v. Phillips & Jacobs, Inc., 614 A.2d 284, 287-88 (Pa. Super. Ct. 1992) (internal quotation marks omitted). Because there is a genuine issue of material fact regarding the date on which Kia learned the amount of his bonus, we cannot grant defendants' motion for summary judgment on the statute of limitations issue. See Am. Eagle Outfitters, 584 F.3d at 581.

Next, defendants contend that the statements contained in the 2006 performance review memorandum are incapable of defamatory meaning. "A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" or if it "ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." Maier v. Maretti, 671 A.2d 701, 704 (Pa. Super. Ct. 1995).

It is for the court to decide whether a statement is capable of defamatory meaning. Zelik v. Daily News Publ'g Co., 431 A.2d 1046, 1048 (Pa. Super. Ct. 1981). In doing so, we must consider the statement in context, including the audience to which it was published. Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa. 1987). We then evaluate "the effect the statement would fairly produce, or the impression it would naturally engender, in the minds of the average persons among whom it is intended to

-29-

circulate." Maier, 671 A.2d at 704. In the employer/employee context, the law distinguishes between "statements about a person's actual job performance" and "statements about a person's fitness to perform his job." Sheehan v. Anderson, No. 98-5516, 2000 U.S. Dist. LEXIS 3048, at *8 (E.D. Pa. Mar. 17, 2000), aff'd, 263 F.3d 159 (3d Cir. 2001). The later may support a claim for defamation while the former will not. Id. (citing Maier, 671 A.2d at 705-06; Wendler v. DePaul, 499 A.2d 1101, 1102 (Pa. Super. Ct. 1985); Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc., 489 A.2d 1364, 1368-69 (Pa. Super. Ct. 1985)); see also Baker, 532 A.2d at 402-03.

The cases of Sheehan v. Anderson and Wendler v. DePaul are instructive here. In Sheehan, a co-worker of the plaintiff informed fellow employees that the plaintiff made negative remarks about their company and about a female employee, that he "fostered an antagonistic work environment," and that he "sat around the work place every morning for approximately one to one and a half hours talking and drinking coffee." 2000 U.S. Dist. LEXIS, at *3. This led to the plaintiff being reprimanded by a superior. In granting summary judgment against the plaintiff on his defamation claim, this court determined that the statements, made to co-workers in the context of plaintiff's employment, were not capable of defamatory meaning. Id. at *9.

In Wendler, the plaintiff, a laborer, was terminated in response to a negative report prepared by the plaintiff's supervisor in connection with an incident in which the plaintiff

suffered a work-related injury.  The report stated that the
plaintiff "had willfully disregarded instructions in proper
material handling procedures," "had improperly attached the
equipment," and had refused to properly attach the equipment
despite being ordered to do so by a fellow employee.  It further
noted that he "was not able to adequately perform the functions
of his job," and that "the job performance of [the plaintiff] is
marginal and many times borders on the unsafe."  499 A.2d at
1102.  The court ruled that these statements, in the context of
an employment-related report prepared by the plaintiff's
supervisor, were not capable of defamatory meaning.  Id.
Although his job performance was criticized, the court explained
that the plaintiff "was not accused of dishonesty or anything
else that would blacken his reputation or expose him to public
hatred, contempt, or ridicule."  Id. (internal quotation marks
omitted).

        Here, in the 2006 performance review, Singh critically
assessed Kia's actual job performance, and, in the email of
December 21, 2006, alluded to Kia's "total lack of productivity."
Singh made these statements as a co-owner of ISI and directed
them to other owners, executives, and human resource personnel
within the company.  The purpose of such communication was to
inform the recipients of Singh's belief that Kia was inadequately
performing the responsibilities of his job.  As in Wendler, Singh
did not accuse Kia of dishonesty, criminal conduct, or anything
else that would tend to "blacken his reputation."  Id.  Under

these circumstances, Singh's statements were incapable of defamatory meaning.

As for Singh's email of 2007 regarding Kia's involvement in the VPN security breach, defendants argue that the allegedly defamatory statements are covered by a conditional privilege.[13]  Pennsylvania law recognizes a conditional privilege where "the [speaker] reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know."  Daywalt v. Montgomery Hosp., 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990).  The question of whether a privilege applies is an issue of law for the court to decide.  Miketic v. Baron, 675 A.2d 324, 327 (Pa. Super. Ct. 1996) (citing Agriss v. Roadway Exp. Inc., 483 A.2d 456, 463 (Pa. Super. Ct. 1984)).  The Pennsylvania Superior Court in Maier v. Maretti held that statements among management-level personnel concerning an employee's job performance are privileged communications necessary for the operation of a business.  671 A.2d at 706 (citing Rutherfoord v. Presbyterian-Univ. Hosp., 612 A.2d 500 (Pa. Super. Ct. 1992)); see also Foster, 2010 Pa. Super. LEXIS 2097, at *15-16.

To determine whether Singh could have reasonably believed that Marandola, Mike Bowen, Dave Cowan, and Stephanie

---

13.  Defendants assert that Singh's statements in the 2006 performance review and the email of December 21, 2006 are also covered by a conditional privilege.  However, as we have already determined that those statements are incapable of defamatory meaning, we need not decide the issue.

Mandell had a common interest in subject matter of the publication, we must determine what Singh was actually communicating. A follow-up email from Singh to Kia sent later that same day provides some insight. In it, Singh explained, "I was merely venting in reaction to your 'for the love of God' statement, an epitome of double standards that consistently apply to your view of others vs. yourself, which was very obviously pointed at Uwe [Mundry] & I, infering we didn't care about the security of our proprietary/sensitive data." This explanation is consistent with the comments made previously by Singh in the 2006 performance review memorandum, in which he stated that Kia had attempted to discredit him and Uwe Mundry, that Kia "lacks tact and constructive communication skills," has an "unconstructive team spirit," and "used disparaging and confrontational language."

Thus, it appears that Singh sent the email to Marandola, Dave Cowan, and Stephanie Mandell not for the purpose of blaming Kia for the security breach, but rather to highlight Kia's "for the love of god" remark as an example of what he felt was a pattern of negative interpersonal behavior on the part of Kia. In this context, Singh's statement is protected by a conditional privilege, as it was reasonable for Singh to believe that ISI's owners, executives, and Human Resources personnel had a common interest in Kia's behavior and attitude towards his fellow employees. It was also reasonable for Singh to believe that Mike Bowen had a common interest in the subject of his

communication because, not only was Bowen included in the list of recipients to which Kia's "for the love of god" comment was sent, he was the IT technician directly involved in setting up the VPN that was the subject of discussion.[14]

A conditional privilege can be overcome by the plaintiff if he proves that the defendant abused the privilege. Miketic, 675 A.2d at 329 (citing Elia v. Erie Ins. Exch., 634 A.2d 657, 661 (Pa. Super. Ct. 1993)).

> Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

Foster, 2010 Pa. Super. LEXIS, at *18 (quoting Moore, 889 A.2d at 1269)). Unless reasonable minds cannot differ, the question of whether or not the defendant abused a conditional privilege is one of fact for the jury to decide. Restatement (Second) of Torts, § 619(2) & cmt. b (1977).

Here, Kia cannot establish abuse of privilege because he has offered no facts which would allow a reasonable jury to find that Singh acted with malice or negligence, that the publication was for a purpose other than that for which the privilege was given, that it was made to a person not reasonably

---

14. We also note that, in his deposition, Singh states that it was Mike Bowan who informed him of Kia's alleged responsibility for the prior virus attack.

believed to be necessary for the accomplishment of the purpose,[15] or that it included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.  See Moore, 889 A.2d at 1262; Miketic, 675 A.2d at 331.  Although Kia accuses Singh of acting with malice or negligence, the only evidence to which he points consists of:  (1) the statement by Singh, in the email of December 21, 2006, regarding Kia's "total lack of productivity," and (2) a statement allegedly made by Marandola in June of 2008, more than a year after the allegedly defamatory email was sent, that Singh was "discriminating against" Kia with regard to the reduction of Kia's bonus.  This evidence has no relevance to the question of whether Singh wrote the April 25, 2007 email with negligence or reckless disregard for the truth of the statements contained therein,[16] and is therefore insufficient to allow a reasonable jury to find that Singh abused the conditional privilege.

_____

15.  Kia contends that Singh's statements in the above-mentioned email were directed to persons who did not have a common interest in the relevant subject matter, specifically, Stephanie Mandell, Mike Bowan, and Dave Cowan.  However, we have already determined that, as a matter of law, it was reasonable for Singh to believe that all recipients of his statements did, in fact, share such a common interest.  Accordingly, we reject Kia's arguments on this issue.

16.  Under Pennsylvania law, a non-public-figure plaintiff seeking to prove abuse of the conditional privilege must establish, at a minimum, that "'the defamatory matter was published with want of reasonable care and diligence to ascertain the truth or, in the vernacular, with negligence.'"  Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa., 923 A.2d 389, 399 (Pa. 2007) (quoting Rutt v. Bethlehems' Globe Publ'g Co., 484 A.2d 72, 83 (Pa. Super. Ct. 1984)).

For the above reasons we will grant summary judgment in favor of the defendants with respect to Kia's Count XIV claim against Singh for defamation.