IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OMID E. KIA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| IMAGING SCIENCES | : | |
| INTERNATIONAL, INC., et al. | : | NO. 08-5611 |

MEMORANDUM

Bartle, C.J.                                                August 30, 2010

      Plaintiff Omid Kia ("Kia") brings this diversity action against his former employer, Imaging Sciences International, Inc. ("ISI") for breach of oral contract and fraudulent conveyance, and against ISI's former owners, Edward Marandola ("Marandola"), Arun Singh ("Singh"), Alan Keim ("Keim"), Henry Tancredi, and John Tancredi, for fraudulent conveyance.[1] Before the court is

---

1. We granted in part and denied in part defendants' motion for summary judgment in a Memorandum and Order on August 20, 2010. As a result, we entered judgment in favor of defendants and against Kia with respect to the following claims in Kia's First Amended Complaint ("Amended Complaint"): Count VII (declaratory judgment) as to all defendants; Count VIII (promissory estoppel) as to ISI; Count IX (promissory estoppel) as to Marandola and Henry Tancredi; Count X (tortious interference with contract) as to Singh; Count XII (unjust enrichment) as to all individual defendants; Count XIII (conversion) as to all individual defendants; and Count XIV (defamation) against Singh.
    In his brief in response to that motion, Kia informed the court that he would no longer pursue the following claims: Count II (breach of oral contract against the individual defendants); Count III (fraudulent inducement of oral contract against all defendants); Count IV (breach of written contract against ISI); Count V (fraudulent inducement of written contract against all defendants); Count VI (negligent misrepresentation against Marandola); Count IX (promissory estoppel) as to Singh, Keim, and

(continued...)

the motion of defendants under Rule 702 of the Federal Rules of Evidence to exclude the testimony of Kia's expert witness, Dr. Dov Maor ("Dr. Maor").

I.

This action stems from the alleged breach of an oral contract between Kia and ISI, which, according to Kia, arose during an employment interview. In December 2003, ISI offered to employ Kia to develop "reconstruction" software for use in dental imaging systems. Prior to that time, ISI licensed such software from another entity, Xoran Technologies ("Xoran"). It is Kia's position that ISI sought to hire him with the expectation that it could attain independence from Xoran's software and thereby avoid paying licencing fees.

According to the Amended Complaint, Kia initially rejected ISI's proposal because he believed the salary offered to him was below market rate. In response, ISI invited Kia to a third interview and raised the salary offer from $85,000 to $108,000. Kia also considered this sum to be inadequate. In his deposition, Kia describes the following exchange between him and defendant Marandola during the interview:

---

1.(...continued)
John Tancredi; Count X (tortious interference with contract) as to Marandola; Count XIV (defamation) as to Marandola; and Count XV (misappropriation of trade secrets against ISI).
　At this stage, only two of Kia's fifteen original counts remain:  (1) Kia's Count I claim against ISI for breach of oral contract, and (2) Kia's Count XI claim against all defendants for fraudulent conveyance.

> I said that that's still very low, that that
> might -- a going rate in a place like this
> would be around $125,000. And 108 is way too
> low.
>
> To which I believe he said, If we can start
> on this, and we don't have a product yet, we
> don't have a large revenue stream, is that as
> things pick up, yours -- your salary, your --
> your compensation would improve as such.
>
> To which I said, Okay, well, we can make
> $108,000 work, given that you guarantee that
> I would be taken care of as the company moves
> forward, starts making the extra salary.
>
> To which he said, What do you -- What do you
> mean exactly?
>
> To which I described, Well, other companies
> utilize different tactics, like golden
> parachutes, golden handcuffs, to take care of
> their key people. And I'm asking something
> in that -- in that sense to make sure that
> I'm taken care of once the value of the
> company goes up, the company starts making
> money.
>
> And he -- he said that, Well, I don't exactly
> know what -- what you mean by golden
> parachutes, by golden handcuffs, but be
> assured of one thing; that you would be one
> of the senior management team, you would be
> one of us, and that the value that you bring
> to the company will be measured in terms of
> the success of the company, and that you
> would be compensated in par with respect to
> the rest of us, meaning the owners.

Kia Dep. 425:3-426:9, Feb. 16, 2010.

Kia asserts that the above conversation resulted in an oral contract between Kia and ISI pursuant to which Kia, in exchange for accepting a below-market salary, would share equally with the owners in any increase in ISI's value, that is, that he would be given a one-sixth interest in the company's increased

equity. Kia does not claim to have been granted any ownership of ISI but rather characterizes his interest as a form of compensation. Kia maintains that his contractual right to a one-sixth share of the increased value of ISI was unconditional and therefore unrelated to his actual job performance. None of the terms of this alleged agreement was reduced to writing.

Defendants deny that the above exchange between Kia and Marandola ever took place and, therefore, assert that no such oral contract exists.

Kia ultimately accepted employment at ISI and began work on January 2, 2004. While there, he maintains that he aided in the development of dental imaging software for ISI's flagship device, the I-CAT, and that device's successor, the I-CAT Platinum. Kia asserts that his efforts were integral to the success of ISI, as he claims to have been the only employee of ISI capable of creating the digital imaging software necessary for the functioning of the I-CAT devices. Defendants contest Kia's characterization of his contribution to the success of ISI.

On January 2, 2007, ISI was sold to the Danaher Corporation ("Danaher"). The five owners of ISI transferred their voting shares to Danaher in exchange for a gross sale price of $140 million. As the owners each held an equal 20% share of voting stock, they divided the net proceeds equally among themselves.

A portion of the sale proceeds was set aside in a pool from which the owners paid discretionary bonuses to employees.

Kia was offered a bonus of $50,000, which he found to be insultingly low. As a result, he initiated the instant action.

II.

Defendants now move to exclude the testimony of Dr. Maor as failing to meet the standards for expert testimony set forth in Rule 702 of the Federal Rules of Evidence. Kia seeks to have Dr. Maor testify that: (1) Kia was hired by ISI so that ISI could develop its own reconstruction software to avoid paying royalties to Xoran; (2) Kia was highly qualified and, through a number of projects during the course of his employment, contributed significantly to the success of ISI; and (3) Kia's allegations regarding his oral contract with ISI are consistent with Dr. Maor's experience regarding the compensation of employees in the imaging industry.[2]

> Rule 702 of the Federal Rules of Evidence provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

2. In his report, Dr. Maor also provides his opinion regarding whether Kia failed timely to file certain provisional patent applications. This is only relevant to Kia's former defamation claim, which is no longer at issue in this action. Thus, we will not discuss Dr. Maor's opinion with regard to this issue.

Pursuant to this Rule, trial judges must act as "gatekeepers" to ensure that "any and all expert testimony or evidence is not only relevant, but also reliable." Kannankeril v. Terminix, Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)). Although Rule 702 prescribes a "'liberal policy of admissibility,'" the decision to admit or exclude expert testimony is ultimately within the discretion of the trial court. Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril, 128 F.3d at 806)).

Rule 702 incorporates three main requirements: qualification, reliability, and fit. Id. at 244. First, to be qualified, a proffered witness must "'possess specialized expertise.'" Id. (quoting Schneider ex rel Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003)). Our Court of Appeals recognizes that "a 'broad range of knowledge, skills, and training qualify an expert.'" Id. (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994)). Indeed, courts have "eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." Paoli, 35 F.3d at 741. Experience alone may be sufficient to qualify an expert. Langbord v. U.S. Dept. of the Treasury, No. 06-5315, 2009 WL 1312576, at *2 (E.D. Pa. May 7, 2009) (citing Fed. R. Evid. 702 advisory committee's note).

Second, an expert's opinion is reliable if it is "based on the methods and procedures of science rather than on

subjective belief or unsupported speculation." Schneider, 320 F.3d at 404 (internal quotation marks omitted). The test for reliability is "a flexible one." Daubert, 509 U.S. at 594. A non-exhaustive list of factors which the court may consider in making a reliability determination includes:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48.

Finally, an expert's opinion "fits" the issues of a case when his testimony would "assist the trier of fact." Daubert, 509 U.S. at 591. Thus, there must be a "connection between the [expert evidence] to be presented, and particular disputed factual issues in the case." United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985). Although this third factor is essentially a relevance requirement, the standard is higher than bare relevance. Daubert, 509 U.S. at 591; Paoli, 35 F.3d at 745 & n.13.[3]

---

3. Under the liberal relevance standard of Rule 401 of the Federal Rules of Evidence, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Dr. Maor purports to have extensive experience with imaging equipment and technology such as that produced by ISI, and also to have business experience within the imaging industry. He received a Master of Science in nuclear physics and a Doctor of Science in atomic physics, both from the Technion, Israel Institute of Technology in Haifa, Israel. He later worked for at least two Israeli imaging-companies, Elscint and InSightec Ltd. While working for those companies, he developed imaging technology and acted in a management role. He was also periodically responsible for hiring and determining compensation packages for employees.

In his expert report, Dr. Maor provides his opinion that ISI hired Kia so that it could avoid paying "exceptionally high" royalties to Xoran for the rights to license Xoran's reconstruction software. Dr. Maor apparently reviewed the terms of the licensing agreement between ISI and Xoran, from which he concludes that "contracts with these types of terms would only be signed by companies who were under extreme pressure or duress to provide a product to the marketplace, and who had no other choice but to sign under very demanding conditions."

Next, Dr. Maor offers his opinion regarding Kia's qualifications to work at ISI. He determines that, in order to avoid paying licensing fees to Xoran, "ISI Inc. had a critical need to obtain a chief scientist with the necessary experience in digital imaging to help develop and guide the generation of ideas to lead to the next generation I-CAT." He concludes that "Kia

was exceptionally qualified" to fill this role.  He then details
a number of specific tasks that Kia completed while employed at
ISI, opines that these tasks were critical to the development of
the I-CAT platinum, and states his opinion that such tasks could
only be completed by someone with a high level of technical
proficiency in the field of digital imaging.

Finally, Dr. Maor provides his opinion regarding the
likelihood that ISI entered into an oral contract with Kia to
provide him with a one-sixth interest in the increased value of
the company.  In his report, Dr. Maor states, "Mr. Marandola's
promise of offering a share of ISI Inc. equal to that of the
owners (which would be roughly 16.5%) is consistent with my
experience that such key employees as Dr. Kia was for ISI Inc.,
would be given a significant percentage of the added value that
they helped to create for the company."  He further concludes
that "[h]i tech start-up companies such as ISI Inc. make [such
compensation arrangements] because they cannot afford to pay very
high salaries."

We need not reach the questions of Dr. Maor's
qualifications and the reliability of the methodology on which
his opinions are premised.  We conclude that his proposed
testimony does not "fit" the factual issues of this case.  It
would not "assist the trier of fact to understand the evidence or
to determine a fact in issue."  Fed. R. Evid. 702; see also
Schneider, 320 F.3d at 404.

The factual issues presented by Kia's claim for breach of oral contract are well within the understanding of a jury and simply do not require the application of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. As the Supreme Court noted in Salem v. U.S. Lines Company,

> expert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge "if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation ...."

370 U.S. 31, 35 (1962) (quoting U.S. Smelting Co. v. Parry, 166 F. 407, 415 (8th Cir. 1909)).

Kia essentially seeks to bolster his own testimony by having Dr. Maor agree with him. However, a party may not "filter fact evidence and testimony through [his] expert merely to lend credence to the same" nor may expert testimony "'be used merely to repeat or summarize what the jury independently has the ability to understand.'" Reedy v. CSX Transp. Inc., No. 06-758, 2007 WL 1469047, at *3 (W.D. Pa. May 18, 2007) (citing Nimely v. City of New York, 414 F.3d 381, 398 (2d Cir. 2005); and quoting S.E.C. v. Lipson, 46 F. Supp. 2d 758, 763 (N.D. Ill. 1998)). Moreover, to allow an expert to opine as to the likelihood that another witness's testimony is truthful would "encroach[] upon the jury's vital and exclusive function to make credibility

determinations." Coney v. NPR, Inc., No. 03-1324, 2007 WL 2571452, at *10 (E.D. Pa. Aug. 31, 2007) (quoting United States v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999)).

First, Dr. Maor's proposed testimony regarding the Xoran licensing agreement is irrelevant to the factual issues presented by Kia's breach of oral contract claim. With respect to that claim, the jury must: (1) decide whether the alleged exchange between Kia and Marandola actually took place, and (2) if so, determine the words used by the parties during that conversation and discern "the understanding of the parties as expressed by those terms." McCormack v. Jermyn, 40 A.2d 477, 479 (Pa. 1945). Kia argues that Dr. Maor's testimony regarding the Xoran royalty fees establishes a motive for ISI to hire Kia and to promise him a one-sixth share in the increased value of ISI, increasing the likelihood that Kia's allegations regarding the existence of that promise are credible. However, Dr. Maor has no first-hand knowledge as to why ISI hired Kia, and any attempt on his part to opine on this subject would be inadmissible speculation. Further, even if ISI was eager to hire Kia, it does not follow that it would have also promised him a one-sixth interest in the company's increased value.

At trial, Kia will be free to question the individual defendants regarding the oppressiveness of Xoran's royalty fees, their motive to hire him, and whether Marandola made him an oral promise on behalf of ISI to share in the increased value of the company. Assessment of these factual matters is well within the

capability of a jury, as they will simply have to decide whether to believe Kia's testimony or that of the defendants. Dr. Maor's opinions are of no assistance here, as it is the duty of the jury, not an expert witness, to decide issues of credibility. See Coney, 2007 WL 2571452, at *10.

Similarly, Dr. Maor's opinions regarding Kia's qualifications and his performance while employed at ISI are also irrelevant. The fact that ISI believed Kia was qualified to perform the job for which it hired him is evident from the very fact that he was hired. Moreover, Kia maintains that his right to share in the increased value of ISI was unconditional and did not depend on his job performance.

Kia contends that Dr. Maor's testimony would show that, at the time he was being interviewed, ISI viewed Kia as a potentially valuable addition to the company and that, in an effort to secure his services, it would have been likely to have entered into the oral contract as alleged by Kia. We reject this argument. To the extent that Kia wishes to establish his qualifications and work performance as a motive for ISI to make the alleged oral promise, he can testify himself. It will not assist the trier of fact to hear from Dr. Maor, who has no first-hand knowledge of Kia's work, rather than from Kia, who does. Kia simply may not use Dr. Maor to bolster his own credibility. See Reedy, 2007 WL 1469047, at *3.

Finally, Dr. Maor proposes to testify that "companies such as ISI" regularly enter employment agreements providing for

equity interests to "key employees [like] Dr. Kia."  That is not a relevant issue here.  The question is whether ISI <u>actually</u> entered into such an agreement with Kia.  This is not a matter which requires "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702.  Indeed, it is not a matter about which Dr. Maor has any knowledge at all.  Accordingly, Dr. Maor's testimony does nothing to assist the jury in determining whether, in this specific instance, ISI and Kia entered into the oral agreement as alleged in Kia's Amended Complaint.  It is therefore inadmissible.  <u>See</u> <u>Schneider</u>, 320 F.3d at 404.

Accordingly, the motion of defendants to exclude the testimony of Dr. Dov Maor will be granted.