IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OMID E. KIA | : | CIVIL ACTION |
| v. | : | |
| IMAGING SCIENCES INTERNATIONAL, INC., et al. | : | NO. 08-5611 |

MEMORANDUM

Bartle, C.J.                                                    September 2, 2010

      Plaintiff Omid Kia ("Kia") brings this diversity action against his former employer, Imaging Sciences International, Inc. ("ISI") for breach of oral contract and fraudulent conveyance, and against ISI's former owners, Edward Marandola ("Marandola"), Arun Singh ("Singh"), Alan Keim ("Keim"), Henry Tancredi, and John Tancredi, for fraudulent conveyance. Before the court is the motion of defendants under Rule 702 of the Federal Rules of Evidence to exclude the testimony of Kia's expert witness, James Reda ("Reda").

I.

      The facts and procedural history of this case are set forth in detail in our Memoranda of August 20, 2010 and August 30, 2010. We repeat here only those facts most relevant to the instant motion.

      Kia seeks to have Reda testify regarding the damages phase of Kia's claim for breach of oral contract. With respect to that claim, Kia alleges that, in the context of a job interview during late December 2003, defendant Marandola made an

oral promise to him, on behalf of ISI. According to Kia, by accepting employment at a salary below that which he would otherwise prefer, he was promised an equal share in any increased value of ISI along with its five owners, Marandola, Singh, Keim, Henry Tancredi, and John Tancredi.[1] Defendants contend that

---

1. Kia describes the conversation between him and Marandola as follows:

> I said that that's still very low, that that might -- a going rate in a place like this would be around $125,000. And 108 is way too low.
>
> To which I believe he said, If we can start on this, and we don't have a product yet, we don't have a large revenue stream, is that as things pick up, yours -- your salary, your -- your compensation would improve as such.
>
> To which I said, Okay, well, we can make $108,000 work, given that you guarantee that I would be taken care of as the company moves forward, starts making the extra salary.
>
> To which he said, What do you -- What do you mean exactly?
>
> To which I described, Well, other companies utilize different tactics, like golden parachutes, golden handcuffs, to take care of their key people. And I'm asking something in that -- in that sense to make sure that I'm taken care of once the value of the company goes up, the company starts making money.
>
> And he -- he said that, Well, I don't exactly know what -- what you mean by golden parachutes, by golden handcuffs, but be assured of one thing; that you would be one of the senior management team, you would be one of us, and that the value that you bring

(continued...)

neither Marandola, nor anyone else, ever made such a promise to Kia, and therefore deny the existence of any contract guaranteeing Kia a share in the increased value of ISI. In any event, Kia began work at ISI on January 2, 2004.

Three years later, on January 2, 2007, the five owners sold their voting shares in ISI to the Danaher Corporation ("Danaher") for $140 million. This sale provided a significant capital gain to those individuals, as Kia asserts that the value of the company at the time he joined was $2.5 million. Because each owner held an equal 20% portion of ISI's voting shares, they split the proceeds equally, with each receiving more than $20 million.

Upon the sale of ISI, Kia was offered $50,000 from a discretionary bonus pool that was set up by the owners to award ISI's employees for their work. Believing that this constituted a breach of his oral contract with ISI, Kia initiated the instant action.

II.

Kia now seeks to have Reda testify as an expert as to the sum that Kia would have received had ISI fulfilled its

---

1.(...continued)
>to the company will be measured in terms of the success of the company, and that you would be compensated in par with respect to the rest of us, meaning the owners.

Kia Dep. 425:3-426:9, Feb. 16, 2010.

alleged obligation to him. Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As our Court of Appeals has repeatedly noted, Rule 702 embodies three requirements: qualification, reliability, and fit. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). An expert is qualified if he "possess[es] specialized expertise." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). This does not necessarily require formal credentials, as "a broad range of knowledge, skills, and training qualify an expert," and may include informal qualifications such as real-world experience. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); Langbord v. U.S. Dept. of the Treasury, No. 06-5315, 2009 WL 1312576, at *2 (E.D. Pa. May 7, 2009) (citing Fed. R. Evid. 702 advisory committee's note). The qualification standard is a liberal one, and an expert may be sufficiently qualified under Rule 702 even if "the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that

-4-

the court considers most appropriate." Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).

To determine reliability, we focus not on the expert's conclusion but rather on whether that conclusion is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." Schneider, 320 F.3d at 404 (internal quotation marks omitted). Our analysis is flexible and may include such factors as:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 247-48.

Expert testimony must also "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Thus, to "fit," such evidence must bear some relation to the "particular disputed factual issues in the case." United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985). Accordingly, this factor has been described as one of relevance. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993); Paoli, 35 F.3d at 745 & n.13.

In his expert report, Reda offers two separate scenarios under which Kia might recover damages. The first is

premised on the terms of the alleged oral contract as described above.  Under this scenario, Reda calculates Kia's damages at $20,158,227.28, which represents his purported one-sixth interest in the increased value of ISI from the day Kia was hired to the day the company was sold to Danaher.  To arrive at this figure, Reda takes the net proceeds from the sale,[2] less the value of ISI at the time Kia was hired, and divides the result by six.

The real dispute with respect to Reda's proposed testimony is his use of the $2.5 million figure as the "value" of ISI at the time Kia was hired.  This figure comes from a written contract (the "Brill Agreement") signed by Edward Brill, a consultant, on October 30, 2003 and by the five owners of ISI on November 2, 2003, less than two months prior to Marandola's alleged promise to Kia.  The agreement was in connection with ISI's engagement of Brill to perform consulting services.  ISI sought to compensate Brill, at least in part, by providing him with some of its shares.  To this end, the Brill Agreement provided:

> 1.  As soon as reasonably possible, 1% (one percent) of the authorized and issued shares of Imaging Sciences International, Inc. (or the appropriate entity if named otherwise) will be issued to the benefit of Edward T. Brill as partial compensation for services

---

2.  In his report, Reda states that part of the net sale proceeds was paid to the owners immediately, while another portion was placed in an escrow account where it gained interest.  Although Reda separates these amounts in his calculation, they are both derived from the sale proceeds and, for present purposes, we will discuss them as one total amount.

-6-

>     rendered during the past five months; and
>     that
>
>     2.  Edward T. Brill will continue to accrue
>     share ownership at a rate of 1% (one percent)
>     for every five months of consulting services
>     provided (in addition to the agreed upon cash
>     portion); and that
>
>     3.  Edward T. Brill is considered a full and
>     legitimate shareholder bound and agreeing to
>     the terms of the most current shareholders
>     agreement binding the above individuals.
>     Edward T. Brill will enjoy the same rights
>     and privileges of the shareholders
>     participating in said shareholders agreement.
>     A new agreement including Edward T. Brill as
>     a shareholder will be executed as soon as
>     practicable, or an addendum attaching Edward
>     T. Brill to said agreement will be prepared
>     by Company's outside counsel; and that
>
>     4.  <u>Edward T. Brill and the shareholders
>     included in the agreement agree and accept a
>     current valuation of the firm of $2.5
>     million.</u>  All subsequent share issues to
>     Edward T. Brill for consulting services
>     rendered will be at this price as was agreed
>     to previously.  (emphasis added).

According to Kia, this $2.5 million figure represented the value of ISI's outstanding shares as agreed by the owners at the time they signed the Brill Agreement.  Because the agreement was signed near the time that he began employment at ISI, he asserts that it also represents the value of ISI's outstanding shares at that time.

Defendants contend that Reda's opinion is inadmissible under Rule 702.  First, they argue that Reda is not qualified to render an expert opinion.  We disagree.  Reda has more than 23 years of experience providing consultation regarding executive

compensation.  As noted above, experience is sufficient to qualify an expert.  <u>Langbord</u>, 2009 WL 1312576, at *2.  Defendants argue that, despite this general rule, Reda's experience in executive compensation is not sufficient here because Kia seeks to have him testify regarding the value of ISI at the time Kia was hired, and Reda has no experience valuing closely-held corporations.  However, Kia has proffered Reda's testimony for the purpose of calculating damages, not calculating ISI's value.  Kia and Reda are relying on the valuation agreed to by the defendants in the Brill Agreement.

Next, defendants assert that Reda has failed to adhere to a reliable methodology in calculating damages under the alleged oral contract.  Specifically, they maintain that Reda's adopting the $2.5 million starting "value" of ISI for the purposes of his calculation is unjustified and erroneous.  The term "value," they argue, is essentially meaningless without further explanation of the sort of value being discussed, such as market value or book value.  Defendants maintain that Reda's use of the $2.5 million starting "value" and the $140 million ending "value" is essentially an apples-to-oranges comparison.  Moreover, they contend that, not only does Reda fail to specify the type of value this $2.5 million figure is purported to represent, he neglects to verify the accuracy of that figure and simply plucks it from the Brill Agreement, a document which, according to defendants, was not intended to establish an

accurate valuation of ISI but rather to provide a basis for the compensation of Mr. Brill.

Defendants' arguments miss the mark. First, with regard to the specific type of "value" being asserted by Reda, one can reasonably infer that the $140 million sale price reflects the value of the shares that ISI's owners sold to Danaher. As for the $2.5 million figure, it is also reasonable to infer that it relates to the value of ISI's shares because the Brill Agreement within which that number is found was created for the express purpose of assigning a monetary value to ISI's outstanding shares. Because both the starting and ending figures in Reda's calculation appear to be premised on the value of ISI's outstanding shares, we cannot conclude that Reda's methodology is necessarily premised on an unreliable apples-to-oranges comparison.

Second, Reda does not, nor could he, opine as to whether the $2.5 million figure was an accurate valuation of ISI at the time Kia was hired. Rather, Kia's source for the $2.5 million figure is the Brill Agreement. Each of the individual defendants, including Marandola, signed that document and thereby agreed to "a current valuation of [ISI] of $2.5 million." This constitutes an admission by the defendants and is therefore admissible under Rule 801(d)(2) of the Federal Rules of Evidence. Reda simply uses this figure for the purpose of calculating Kia's damages for breach of the alleged oral contract. As is often the case with expert testimony, Reda must assume certain facts in

order to provide his opinion.  The $2.5 million value of ISI is one of them.

Defendants contend that, at the time the Brill Agreement was drafted, the $2.5 million figure was not the result of an actual valuation but instead was an unsubstantiated number that ISI's owners concocted for the sole purpose of placing a monetary value on the shares that Brill was to receive as compensation for his consulting services.  In short, defendants argue that the number is not accurate.  However, as our Court of Appeals noted in Paoli, litigants proffering expert testimony "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable."  35 F.3d at 744.  Moreover, "[t]he grounds for [an] expert's opinion merely have to be good, they do not have to be perfect."  Id.  Here, Reda's opinion is essentially nothing more than the application of a mathematical formula, the reliability of which no one contests.  Whether the $2.5 million figure on which he premises that calculation is accurate is an issue of fact for the jury to decide.  Accordingly, Reda's proposed testimony with regard to his first theory of damages is admissible.  If defendants believe their admission of value should not be accepted by the jury here, they are free to make that argument at trial.

Under Reda's second damages theory, he calculates the amount to which Kia would allegedly be entitled under the terms

of a written employment agreement that supposedly accompanied ISI's first job offer to Kia, that is, the offer that he rejected as insufficient.[3] That document purportedly contained provisions setting forth a short-term cash bonus and a long-term bonus in the form of stock. By comparing the compensation received by employees situated similarly to Kia, Reda estimates that, taking into account both cash bonuses and equity compensation, Kia would be entitled to $5,695,263.30 pursuant to the terms of the alleged written agreement.

---

3. Reda's discussion of this written employment agreement is premised on a single statement by Marandola in a written interrogatory response dated August 17, 2009. That response provides, in relevant part:

> Mr. Marandola initially offered Dr. Kia a salary of $80,000, as reflected in a written offer setting forth other terms such as benefits and a discretionary annual bonus based on the company's performance and an assessment of Dr. Kia's individual performance. Dr. Kia thanked Mr. Marandola for the offer but rejected the proposed salary as too low. After speaking with Dr. Kia further and learning that he was undergoing financial difficulties with Montana, a company to which Dr. Kia allegedly owed money, Mr. Marandola offered Dr. Kia a $109,000 salary along with a written offer containing the same additional terms as before. Dr. Kia accepted the offer. No other agreements were reached, and Mr. Marandola made no other promises or assurances to Dr. Kia.

This one statement by Marandola appears to be an aberration, as Kia and the defendants now maintain that no written agreement between Kia and ISI was ever signed or otherwise existed.

Reda's proposed testimony regarding this second theory of damages is inadmissible. Kia does not premise his breach of <u>oral</u> contract claim on the alleged <u>written</u> agreement discussed by Reda. In fact, Kia states that he never signed or otherwise agreed to any terms set forth in that document and that he had never even seen it before it was produced during discovery in this litigation. Kia Dep. 686:2-687:5, Feb. 16, 2010. Reda's opinion with respect to that document is simply irrelevant, and therefore cannot satisfy the "fit" requirement of Rule 702. Thus, we will grant defendants' motion to exclude Reda's testimony with respect to his second theory of damages.

Kia also proffers Reda's testimony regarding common compensation practices, specifically with regard to employees in positions similar to that held by Kia at ISI, and his opinion that the alleged oral agreement between Kia and ISI is in line with those practices. In his brief in opposition to the instant motion, Kia asserts that "Reda's testimony confirms that it would not be outside the realm of his experience for a company in ISI's precarious position at the end of 2003 to offer [Kia] a share of the company."

We will not permit Reda to testify in this regard. As discussed in our Memorandum of August 30, 2010 regarding Kia's other proposed expert, Dr. Dov Maor, such testimony would not "assist the trier of fact." Fed. R. Evid. 702. The only factual issues in this case are whether ISI actually entered an oral agreement with Kia, the terms of that agreement, if any, and the

intentions of the parties with respect to such terms. See McCormack v. Jermyn, 40 A.2d 477, 479 (Pa. 1945). The fact that the alleged agreement "would not be outside the realm" of Reda's experience is irrelevant. The jury's determination regarding the existence of an oral agreement ultimately depends on which version of the facts it finds most credible—that of Kia or that of the defendants. Credibility determinations are matters within the purview of the jury, not an expert witness. See Coney v. NPR, Inc., No. 03-1324, 2007 WL 2571452, at *10 (E.D. Pa. Aug. 31, 2007). Moreover, with respect to liability, all of the factual issues presented in this case are ones that can be evaluated by the jury without the assistance of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. Accordingly, Reda's testimony on this issue would not satisfy the "fit" requirement under Rule 702, and we will exclude it. See Salem v. U.S. Lines Co., 370 U.S. 31, 35 (1962).

We will deny defendants' motion to exclude the testimony of James Reda regarding damages as a result of the alleged breach of oral contract but will grant defendants' motion as to Reda's opinion regarding damages under the alleged written contract and his opinion that ISI's oral promise, as alleged by Kia, comports with his experience.